UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**In re:**

**Endicott Johnson Corporation, HM Father and**          **Bankruptcy Case 99-66539**
**Son Shoe, Inc., and Father & Son Shoe Stores, Co.,**          **Chapter 11**
                                                                **(Jointly Administered)**

                                        **Debtors.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**Official Committee of Unsecured Creditors of**
**Endicott Johnson Corporation, HM Father and**
**Son Shoe, Inc., and Father & Son Shoe Stores, Co.,**

                                        **Plaintiff-Appellee,**

                            **-v-**                                       **5:04-CV-689**
                                                                **(Adversary Proceeding**
**George Newman, and George Newman & Company,**          **00-80252A)**
**a/k/a George Newman Company, and Newman**
**Properties, Ltd.,**

                                        **Defendants-Appellants.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:
Harris, Beach, LLP
Wendy A. Kinsella, Esq., of Counsel
Lee E. Woodard, Esq., of Counsel
Donald J. Martin, Esq., of Counsel
One Park Place
300 South State Street
Syracuse, New York 13202
Attorneys for Defendants-Appellants

Kronish, Lieb Weiner & Hellman LLP
Ronald R. Sussman, Esq., of Counsel
Jay R. Indyke , Esq., of Counsel
1114 Avenue of the Americas
New York, New York 10036-7798
and
Menter, Rudin Law Firm
Jeffrey A. Dove, Esq., of Counsel
500 South Salina Street, Suite 500
Syracuse, New York 13202
and
Hancock, Estabrook Law Firm

Stephen A. Donato, Esq., of Counsel
1500 MONY Tower I
Syracuse, New York 13221
Attorneys for Plaintiff-Appellee

**Hon. Norman A. Mordue, D.J.:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

Presently before the Court is an appeal from a Memorandum-Decision, Findings of Fact, Conclusions of Law and Order of Hon Stephen D. Gerling, Chief United States Bankruptcy Judge, Northern District of New York, dated January 26, 2004, resolving this adversary proceeding which stems from a Chapter 11 Bankruptcy Case. For the reasons set forth herein, this Court affirms in all respects.

### BACKGROUND

In August 1996 appellant George Newman ("Newman") formed a company, Newman Properties, Ltd. ("NPL"), a limited liability company, of which Newman owns 100% of the equity interest.[1] Newman formed NPL for the purpose of acquiring Endicott Johnson Corporation ("EJC") from Hanson America, Inc. ("Hanson America") (later Millennium America, Inc.) and HM Holding, Inc. In connection with the sale, Hanson America transferred approximately $3.5 million to EJC.[2] Newman served as chairman of the board of EJC beginning

---

[1]

The facts set forth herein are undisputed unless otherwise stated and are drawn from the parties' "Joint Stipulation of Uncontested Facts," the Bankruptcy Court records including the trial transcript, Judge Gerling's decision of January 26, 2004, and the parties' briefs to this Court.

[2]

According to Newman, Hanson America, as seller, paid this sum in order to compensate for the fact that EJC's net worth at the time of acquisition in October 1996 was below the target net worth of $12,379,000 set forth in the stock purchase agreement dated August 1, 1996.

in October 1996 and as its president beginning in December 1998.

EJC entered into a Management Agreement with defendant George Newman & Company, a/k/a George Newman Company ("GNC"), whereby Newman as an employee of GNC provided management services to EJC.  Newman was sole shareholder and director of GNC, which engaged in stock trading, exploring potential acquisitions, and providing management and consulting services.

On December 13, 1999, EJC, HM Father and Son Shoe, Inc., and Father & Son Shoe Stores, Co. (collectively, "debtors") filed voluntary petitions pursuant to Chapter 11 of the Bankruptcy Code.  On December 26, 2000, the Official Committee of Unsecured Creditors ("Committee") commenced this adversary proceeding against Newman, GNC and NPL.  In this adversary proceeding, the Committee seeks determinations that $2,972.309.81 transferred by EJC to GNC between March 1997 and August 1999 constituted loans from EJC to GNC; that GNC transferred no monies back to EJC; and that Newman, GNC and NPL are individually are liable on the loans.  The Committee also seeks to avoid transfers made by Newman to GNC totalling $4,523,234.09 (including the $2,972.309.81 in alleged loans) on the ground that they were preferential and fraudulent.

On January 26, 2004, after a three-day trial, Judge Gerling issued the Memorandum-Decision, Findings of Fact, Conclusions of Law and Order which is now on appeal.  Judge Gerling found that Newman was the alter ego of GNC and that Newman and GNC are jointly liable to pay $3,162,331.40 to the bankruptcy estate.  This sum includes $2,972,309.81, which Judge Gerling found constituted loans from EJC to GNC, for which both GNC and Newman are liable.  It further includes $187,224.17 in transfers from EJC to GNC and on behalf of Newman,

which Judge Gerling found were constructively fraudulent under section 273 of New York

Debtor and Creditor Law ("NYDCL") because they were made while EJC was insolvent.  And it

includes $2,797.32 in transfers from EJC in the form of automobile payments on behalf of

Newman and GNC, which Judge Gerling found were preferential transfers under the Bankruptcy

Code.

Newman, GNC and NPL (collectively, "appellants") appeal to this Court.  The issues on

appeal are as follows:

> 1. Whether Bankruptcy Court erred in finding that transfers in the amount of $2,972,309.81 made by EJC to GNC were loans.

> 2. Whether Bankruptcy Court erred in concluding that the corporate veil of GNC should be pierced so as to impose liability for the $2,972,309.81 debt upon Newman individually.

> 3. Whether Bankruptcy Court erred in holding that payments by EJC to Star/Firstar Bank in the amount of $2,797.32 were preferential payments.

> 4. Whether Bankruptcy Court erred in holding that payments in the amount of $187,224.17 made between April 1 and December 12, 1999, by EJC to GNC pursuant to the Management Agreement were constructively fraudulent.

This Court affirms.

## DISCUSSION

Judge Gerling's decision clearly and accurately sets forth the pertinent facts.  This

Court does not repeat them here except as necessary to discuss the issues on appeal.

On an appeal to district court, a bankruptcy court's findings of fact "shall not be set

aside unless clearly erroneous, and due regard shall be given to the opportunity of the

bankruptcy court to judge the credibility of the witnesses."  Fed. R. Bankr. P. 8013.  A

bankruptcy court's conclusions of law are subject to *de novo* review.  *See In re Ionosphere*

-4-

*Clubs, Inc.*, 922 F.2d 984, 988 (2d Cir. 1990).  Finally, matters of discretion are reviewed for

abuse of discretion.  *See In re Boodrow*, 126 F.3d 43, 47 (2d Cir. 1997).

    The Court turns to address each of the four issues raised on appeal.

**1.  Whether the Bankruptcy Court erred in finding that transfers in the amount of
$2,972,309.81 made by EJC to GNC were loans.**

    Appellants challenge Judge Gerling's conclusion that the unclassified transfers in the

amount of $2,972,309.81 from EJC to GNC were loans for which EJC is entitled to be repaid.

According to appellants' version of events, Hanson America, which sold EJC to NPL, was

obligated to pay to NPL a purchase price adjustment of $3.5 million; however, because NPL

had no corporate account with which to receive the funds, Hanson America instead paid the

sum to EJC.  Appellants urge that the $2,972,309.81 transfers from EJC to GNC reflect partial

repayment of EJC's obligation to turn over the $3.5 million to NPL.  In support of this

scenario, appellants rely on GNC's own books and records as well as the testimony of

Newman and Scott Davis, EJC's treasurer.

    In reviewing Judge Gerling's rejection of appellants' scenario and his conclusion that

the $2,972,309.81 represents a loan from EJC to GNC, this Court has reviewed the testimony

of the Committee's expert, Kenneth Simon, C.P.A.  This testimony fully supports Judge

Gerling's conclusion.  Simon testified that EJC is a wholly-owned subsidiary of NPL; that the

consolidated financial statements of NPL and EJC show $2,972,309.81 as a receivable due to

EJC from Newman[3]; that no part of the $2,972,309.81 was ever repaid to EJC; that if  EJC

_____

[3]

Simon explained that this amount was shown in the consolidated financial statements of NPL
and EJC as an asset in the form of a "member receivable," that is, as monies due from
Newman, the sole member.

actually owed NPL $3.5 million, the debt should have appeared on EJC's internal balance sheets as a payable from EJC to NPL, which it did not; that if (as Newman contends) the $2,972,309.81 was actually partial payment of $3.5 million owed by EJC to NPL, the consolidated statements would not have listed the $2,972,309.81 as a receivable; that the $2,972,309.81 was paid to GNC and recorded in GNC's financial records as a capital contribution; and that as the sole shareholder of GNC, Newman was the only one who could make a capital contribution to GNC.  Simon concluded: "I believe the internal financial statements, the audited financial statements, the tax return all support the concept that this was, in fact, monies that are owed to Endicott Johnson by George Newman, the individual."

Judge Gerling notes that appellants' answer and first amended answer to the adversary complaint, Newman's affidavit in support of appellants' motion to dismiss the adversary complaint, and Newman's sworn testimony in April 2000 all admit that EJC loaned $2,972,309.81 to GNC and that this sum was owed to EJC.  In rejecting appellants' contention that this sum is not owed to EJC, but rather reflects EJC's partial satisfaction of an obligation to pay $3.5 million to NPL, Judge Gerling states as follows:

> EJC's audited financial statements, Newman's own sign-off on those statements, as well as Newman's own sworn statements confirm that the $2.98 million in "unclassified" transfers represented a loan to be repaid to EJC.  At the trial, Newman was asked,
>
> > let me see if I understand where we are. After your review of the company's internal income statements that carry the $2.9 million as a receivable from 1996 all the way through October of 1999, and after all the answers that you've testified where you swore that the money was a loan from Endicott Johnson to GNC, and after your sworn statements in both affidavit form and in oral testimony that the $2.9 million and change was a loan from Endicott Johnson Corporation to GNC, after all of that, you now today want this Court to believe, oops, it's a mistake, it was never a loan, is that right?

To which Newman replied, "Yes."

Even after amendment, an admission in an original pleading is evidence of the fact admitted. This Court has difficulty finding the change in Newman's position credible. This is particularly true given the fact that the $3.5 million paid to EJC pursuant to the Stock Purchase Agreement, which Defendants contend was a loan to EJC, was never recorded as a liability to GNC/NPL/Newman on EJC's financial statements. There were no loan agreements or promissory notes executed to support the position now taken by Defendants. In addition, Simon testified that there was no significant account payable which appeared on the books of GNC.[4] Instead, it appeared from the balance sheet on GNC's 1998 tax returns that Newman had taken credit for the monies transferred from EJC to GNC in excess of $2 million as capital contributions made by him to GNC that year.

In addition, there are the terms of the Stock Purchase Agreement to be considered, which required that Newman, as "Principal Member" of NPL, make capital contributions for the three years following the closing in October 1996 sufficient to fund all the ongoing business operations of EJC. Newman testified that at the time the $3.5 million was paid to EJC, the company was in need of capital to purchase Christmas inventory. According to the testimony, there were no other capital contributions made to EJC during the three years following the closing. Instead, EJC found it necessary to obtain a line of credit from Paragon sometime in 1998.

Accordingly, the Court concludes that the "unclassified" transfers made by EJC to GNC constituted loans, totaling $2,972,309.81, which must be repaid to the Debtors.

(Case citations, internal quote and citations to record omitted.)

This Court's review of the record demonstrates that there is ample factual support for Judge Gerling's conclusion on this issue. In particular, this Court relies on Simon's expert testimony and Newman's trial testimony on September 12, 2002, wherein he was questioned in some detail regarding the differences between his trial testimony and his previous

---

[4]

Appellants seize on this statement and argue that the lack of an "accounts payable" entry for this sum in GNC's books supports their contention that this sum was not a loan which GNC was required to repay. Presumably, Judge Gerling meant to say "accounts receivable" instead of "accounts payable." In any event, regardless of the significance of this particular observation, there is ample record support for Judge Gerling's conclusion that the $2,972,309.81 transferred by EJC to GNC constituted loans.

testimony in April 2000. While appellants point to certain evidence in support of their

contentions, specifically GNC's own books and records and the testimony of Newman and

Davis, this merely creates a factual issue which Judge Gerling resolved in favor of the

Committee, based on the evidence and his evaluation of Newman's credibility.[5]  Accordingly,

there is no basis to find that Judge Gerling made clearly erroneous factual findings, failed to

apply proper legal standards, or otherwise erred with respect to this issue.

**2.  Whether the Bankruptcy Court erred in concluding that the corporate veil of GNC should be pierced so as to impose liability for the $2,972,309.81 loan upon Newman individually**.

Appellants next take issue with Judge Gerling's determination that Newman

dominated and controlled GNC such that GNC's corporate existence should be disregarded,

thus rendering Newman personally obligated to repay the $2,972,309.81 owed by GNC to

EJC.  Appellants do not challenge Judge Gerling's conclusion that the law of the State of

Delaware applies, nor do they challenge his statement of applicable Delaware law with

respect to piercing the corporate veil.  Rather, they dispute the manner in which he applied the

law to the facts of this case.

In addressing appellants' contentions, this Court first notes that Judge Gerling

correctly summarizes the applicable law.  Delaware law requires a party seeking to pierce the

corporate veil to show: (1) that the two entities in question actually "operated as a single

economic entity"; and (2) that an "overall element of injustice or unfairness" is present.

*Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) (stating Delaware law, citing *Harper*

---
[5]

With respect to Newman's credibility, the Court notes also the inconsistencies in his
testimony regarding the $3.5 million payment from Hanson America to EJC, of which the
$2,972,309.81 was allegedly partial payment to NPL.

*v. Delaware Valley Broadcasters, Inc.*, 743 F.Supp. 1076, 1085 (D.Del.1990), and *Harco*

*Nat'l Ins. Co. v. Green Farms, Inc.*, 1989 WL 110537 at *4-*5 (Del.Ch.1989)).

      With respect to the first element – whether the two entities in question actually

operated as a single economic entity – Delaware courts have repeatedly applied the factors

enunciated in *Harco*:

> [A]n alter ego analysis must start with an examination of factors which reveal how the
> corporation operates and the particular defendant's relationship to that operation. These
> factors include whether the corporation was adequately capitalized for the corporate
> undertaking; whether the corporation was solvent; whether dividends were paid,
> corporate records kept, officers and directors functioned properly, and other corporate
> formalities were observed; whether the dominant shareholder siphoned corporate
> funds; and whether, in general, the corporation simply functioned as a facade for the
> dominant shareholder.

1989 WL 110537 at *4 (quoting *United States v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1104

(D.Del. 1988)).  It is well established in Delaware law that "that no single factor could justify

a decision to disregard the corporate entity, but that some combination of them was required,

and that an overall element of injustice or unfairness must always be present, as well."

*Harco*, 1989 WL 110537 at *5 (quoting *Golden Acres, Inc.*, 702 F.Supp. at 1104).

      In applying this law to the facts of this case, Judge Gerling states as follows:

> The record in this case is replete with examples of instances in which Newman used
> the assets of GNC for purely personal purposes that could not conceivably benefit the
> corporation. He testified that he used GNC's corporate funds to pay his personal
> income taxes; to pay for the maintenance and repairs of his home office in
> Massachusetts; to purchase a computer and graphing calculator for his son's use in
> school; to pay expenses of his children while they were attending Cincinnati County
> Day School; to pay personal debts (Visa cards) of family members who had no
> connection with the corporation other than by virtue of their relationship to Newman;
> to pay a gardener, cook and part-time household help at his residence in Cincinnati;
> to pay expenses at the Cincinnati Country Club; to pay legal expenses associated
> with a family partnership for estate planning purposes; and to pay the expenses on
> his thirteen automobiles. These are transactions that provided personal benefit to
> Newman, but provided no conceivable benefit to GNC.

In addition, a review of the factors set forth in Harco supports the conclusion that Newman used GNC "as a facade for the dominant shareholder"- himself.  Supporting facts include: (1) that GNC did not conduct regular board meetings; (2) that it did not pay dividends; (3) by Newman's own testimony, that he used company employees to handle his own personal business; and (4), as noted above, Newman used corporate funds to pay his own personal expenses and those of family members not otherwise affiliated with the company. *See also HMG/Courtland Properties, Inc. v. Gray*, 729 A.2d 300, 310 n.9 (Del. Ch. 1999) (stating that "[i]n the case of a corporate veil piercing argument, the failure of the corporate entity to follow formalities is evidence that its owners are using it as a mere agent and that the corporation is not in fact a free-standing, accountable entity"). In sum, Newman treated GNC not as a separate "free-standing, accountable entity" but rather as "a mere agent" of himself, mingling corporate and personal business in a manner justifying piercing the corporate veil.

Accordingly, the Court finds in favor of the Plaintiff on this cause of action and finds that the "unclassified" transfers made by EJC to GNC/Newman were loans, for which GNC and Newman are liable in the amount sought by the Plaintiff of $2,972,309.81.

(Citations to record omitted.)

In challenging Bankruptcy Court's analysis of the first element, that is, whether Newman and GNC actually operated as a single economic entity, appellants argue that Judge Gerling "improperly over-emphasized certain of the *Harco* factors while discounting or even excluding consideration of others."  Appellants assert that Judge Gerling did not adequately consider the following factors: that GNC was adequately capitalized during the period in question; that it was solvent during the period in question; that corporate records were kept; that Newman "did not simply siphon funds from GNC but that records and reconciliations were kept with respect to transfers related to Mr. Newman"; and that GNC did, in fact, function as an entity separate and apart from Newman.  Appellants do not deny that Newman used GNC personnel and assets for personal purposes, but contend that "an annual reconciliation was performed in order to account for same[,]" that the use of GNC assets was

-10-

"merely a perquisite afforded to Mr. Newman[,]" and that "a mere perquisite should not rise to the level of a piercing of the corporate veil, particularly considering that other factors are not present or militate against a finding of corporate veil piercing."

There is no error in Judge Gerling's factual findings on the issue of whether GNC and Newman operated as a single economic entity. He properly applied the *Harco* factors and concluded that Newman exercised total control over GNC and used it "as a facade for the dominant shareholder – himself." Although Newman testified that the use of GNC corporate funds for personal purposes was "reconciled" or "recorded",[6] he acknowledged on cross-examination that in fact there were a number of "inflows" and "outflows" between GNC and Newman which were not characterized in any manner which would support Newman's reconciliation theory. These sums exceed $650,000. Clearly Newman's reconciliation testimony does not undermine Judge Gerling's conclusion that Newman dominated and controlled GNC such that the two operated as a single economic entity.

With respect to the second element – whether an overall element of injustice or unfairness is present – appellants argue that the Committee has failed to make a showing of fraud or injustice. It is well established that "a showing of fraud or wrongdoing is not necessary under an alter ego theory, but the plaintiff must demonstrate an overall element of injustice or unfairness." *Fletcher*, 68 F.3d at 1458 (citing *Harco*, 1989 WL 110537 at *5); *accord In re Foxmeyer Corp.*, 290 B.R. 229, 236-37 (Bkrtcy.D.Del. 2003) (rejecting argument

---

[6]

At trial, Newman testified that records were kept regarding whether a payment by GNC was for personal or corporate purposes and then the personal payments were "reconciled" either by being "charged against the capital account, the money that [he] had put into the company, or they were treated as compensation to [him] for tax purposes."

that to pierce corporate veil court must find that corporation was a sham and existed solely as vehicle for fraud; holding that, although showing of fraud or wrongdoing is not necessary under alter ego theory, plaintiff must demonstrate overall element of injustice or unfairness which is not simple in nature but rather similar in nature to fraud or sham).

The evidence that Newman completely dominated and controlled GNC such that it constituted his alter ego, and that he systematically used this domination and control to divert millions of dollars of EJC funds through GNC to the benefit of himself and to the detriment of EJC creditors, amply demonstrates an overall element of injustice which is similar in nature to a fraud or sham.  Thus, Judge Gerling properly applied the law to the facts herein and concluded that the corporate veil should be pierced, thus rendering Newman liable for GNC's obligations.  Accordingly, there is no basis to find that Judge Gerling made clearly erroneous factual findings, failed to apply proper legal standards, or otherwise erred with respect to this issue.

**3.   Whether the Bankruptcy Court erred in holding that payments by EJC to Star/Firstar Bank in the amount of $2,797.32 were preferential payments.**

It is undisputed that about a month before the bankruptcy filing EJC made three payments totalling $2,797.32 to Star/Firststar Bank and that the payments were made in connection with the purchase of a new vehicle on behalf of Newman.  Judge Gerling held that the payments constituted avoidable preferences under the Bankruptcy Code.  In so holding, he rejected appellants' contention that the payments fell within section 547(c)(1) of the Bankruptcy Code, which prohibits a trustee from avoiding a transfer to the extent that it (1) was intended by the parties as "a contemporaneous exchange for new value given to the debtor" and (2) was in fact a substantially contemporaneous exchange.  11 U.S.C. § 547(c)(1).

-12-

Judge Gerling's decision in this regard states:

> "'New value' for § 547(c) purposes includes 'money or money's worth in goods, services or new credit.'" *Jones Truck Lines, Inc. v. Cent. States* (*In re Jones Truck Lines, Inc.*), 130 F.3d 323, 327 (8th Cir. 1997). In *Jones* the court discussed the value given by a debtor's employees in providing services to the debtor in exchange for payment of salary and benefits when due. *Id*. The court found such payments contemporaneous exchanges for "new value," namely the employees' continuing services. *Id*. In this case, the payments to or on behalf of GNC/Newman were made on a regular monthly basis pursuant to the terms of the Management Agreement in exchange for the services rendered by GNC/Newman. The only departure from the regular monthly payments occurred in connection with the payments to Star/Firstar Bank one month prepetition on account #327 16623 totaling $2,797.32. With respect to the balance of the payments, totaling $249,584.93, the Court concludes that they were made contemporaneously in exchange for the services rendered by GNC/Newman and do not constitute preferences.
>
> However, in the view of the Court the payments totaling $2,797.32 represent a change in the amount of the regular monthly payments made to Star/Firstar Bank during the prior eleven months, were made approximately a month prior to the petition and appear to be on a different account number. It is just such transfers that Code § 547 was intended to deter, namely "unusual action by either the debtor or [its] creditors during the debtor's slide into bankruptcy." H. Rep. No. 595, 95th Cong., 1st Sess. 373 (1977), reprinted in 1978 U.S.C.C.A.N. 6329. As previously found, Newman was an insider of EJC and had to have known of EJC's financial difficulties in that month prepetition. Yet, he apparently chose to purchase a new vehicle shortly before EJC filed its petition. Such actions are not to be countenanced by this Court. Pursuant to Code § 547(f), there is a presumption that EJC was insolvent at the time of those payments since they were all made within 90 days of the chapter 11 filing. Accordingly, the Court concludes that only $2,797.32 in transfers made on behalf of GNC/Newman were preferential and may be avoided by the Plaintiff.

(Footnote omitted.)

Appellants do not point to any factual error by Judge Gerling, nor do they claim he erred in the law. Rather, they assert that he incorrectly applied the law to the facts in reaching the conclusion that the $2,797.32 transfer was preferential. Appellants argue that this conclusion is inconsistent with his conclusion that other monthly payments were not preferential. They further assert that these payments should be viewed as "regular" rather

-13-

than "unusual" because "the use of automobiles by Mr. Newman was a standard perquisite made available to Mr. Newman throughout his tenure at EJC."

Contemporaneous exchanges for new value[7] under section 547(c)(1) "are not preferential because they encourage creditors to deal with troubled debtors and because other creditors are not adversely affected if the debtor's estate receives new value." *In re Jones Truck Lines, Inc.*, 130 F.3d 323, 326 (8th Cir. 1997). "A transfer does not diminish the estate if the estate receives 'new value' on account of and equal to the amount of the transfer." *In re Cocolat, Inc.*, 176 B.R. 540, 548 (Bankr.N.D.Cal.1995); *accord In re Schick*, 1998 WL 397849, *5 (S.D.N.Y. 1998) (stating that the purpose of the exception is to protect transactions "to the extent they simultaneously replenish the bankruptcy estate").

Here, the additional payments for a new, more expensive vehicle effectively constituted an increase in compensation to Newman for continuing to provide the same managerial services that he had previously been providing. Thus, the bankruptcy estate was diminished by the amount of the increased payments for which it did not receive increased value. Judge Gerling's conclusion that these unusual irregular payments did not constitute an exchange for new value is supported by the record and is a proper application of section 547(c)(1). This conclusion is also consistent with his holding that the amounts customarily paid for Newman's continuing services did constitute contemporaneous exchange for new value. *See Jones Truck Lines*, 130 F.3d at 327. His ruling on this issue is correct in all

---

[7] "New value" is defined in 11 U.S.C. § 547(a)(2) as "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation[.]"

-14-

respects.

**4. Whether Bankruptcy Court erred in holding that payments in the amount of $187,224.17 made between April 1 and December 12, 1999, by EJC to GNC pursuant to the Management Agreement were constructively fraudulent.**

Judge Gerling held that transfers made to GNC and on behalf of Newman from April 1 to December 12, 1999, were fraudulent pursuant to section 273 of NYDCL, which provides: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." Under New York law, preferential payments to insiders of an insolvent debtor corporation are deemed to have been made without fair consideration. *See Farm Stores, Inc. v. School Feeding Corp.*, 477 N.Y.S.2d 374, 378 (2d Dep't 1984), *aff'd* 64 N.Y.2d 1065 (1985) (cited in *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995)).

Appellants first claim that the payments in issue were not made to an "insider" of EJC because they were made to GNC, which was not an insider of EJC. However, this Court has already determined that Judge Gerling correctly pierced GNC's corporate veil on the ground that Newman and GNC operated as a single entity. Accordingly, payments by EJC to GNC were tantamount to payments by EJC to Newman, who was indisputedly an EJC insider.

Appellants also dispute Judge Gerling's conclusion that EJC was insolvent during the period between April 1 and December 12, 1999. In challenging this conclusion, appellants do not point to any error of law, nor do they point to specific factual errors. Rather, appellants contend (1) that Judge Gerling "summarily concluded" that EJC was insolvent beginning in April 1999, and (2) that this conclusion is inconsistent with other portions of Judge Gerling's

decision and against the weight of the evidence.

A careful reading of Judge Gerling's decision refutes both of these contentions.  Judge Gerling reviewed EJC's financial statements and other records bearing on the three-year period from October 1996 until October 1999.  He rejected Simons' conclusion that EJC was insolvent throughout the entire three-year period.  He found, however, that at some point during the one-year period preceding the bankruptcy filing on December 13, 1999, EJC ceased to be a going concern.  He based this finding in part on his examination of EJC's post-petition record, which demonstrated that EJC was in "serious financial straits" in 1999.  He then found a significant decrease in sales by EJC as compared to the previous year, beginning in April 1999 and continuing until the filing of the petition.  Based on these findings, he concluded that EJC had become insolvent as of April 1, 1999.  There is no basis to find that Judge Gerling made clearly erroneous factual findings, failed to apply proper legal standards, or otherwise erred with respect to this issue.

## CONCLUSION

It is therefore

ORDERED that the Memorandum-Decision, Findings of Fact, Conclusions of Law and Order of Hon Stephen D. Gerling, Chief United States Bankruptcy Judge, Northern District of New York, dated January 26, 2004, is affirmed in all respects.

IT IS SO ORDERED.

July 5, 2005
Syracuse, New York

Norman A. Mordue
U.S. District Judge

-16-